IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

CHARLYNDA BENJAMIN,

     Plaintiff,

v.

EXPERIAN INFORMATION
SOLUTIONS, INC.,

     Defendant.

CIVIL ACTION NO.
1:20-cv-02466-CC-RDC

## ORDER AND FINAL REPORT & RECOMMENDATION

Before the Court are the parties' Cross-Motions for Summary Judgment. (Docs. 48, 49). Plaintiff Charlynda Benjamin brings this action pursuant to 15 U.S.C. § 1681e(b) of the Fair Credit Reporting Act ("FCRA"), challenging Defendant Experian Information Solutions, Inc.'s ("Experian") procedures for updating debts discharged through Chapter 7 of the Bankruptcy Code. For the reasons discussed below, the undersigned **RECOMMENDS** that the District Court **DENY** Plaintiff's Motion for Partial Summary Judgment (Doc. 48) and **GRANT IN PART** and **DENY IN PART** Defendant's Motion for Summary Judgment (Doc. 49).

## I.     BACKGROUND

### A. Procedural History

On November 6, 2020, Plaintiff opened this action by filing the complaint against Experian for one count of violating 15 U.S.C. § 1681e(b) of the FCRA. (Doc. 1).  Plaintiff alleged that Experian, a credit reporting agency ("CRA") as defined in 15 U.S.C. § 1681a(f), failed to maintain reasonable procedures in reporting a debt that was discharged in her Chapter 7 bankruptcy.[1]  According to the complaint, Plaintiff opened an account with MoneyLion, Inc. (the "Account") in August 2019.  She filed for bankruptcy in this district in September 2019.  On January 6, 2020, her bankruptcy was discharged, but she discovered in May 2020 that Experian continued to reflect an owed balance of $330 and a past-due amount of $139 on the Account.  Particularly relevant to this case, Plaintiff also alleged that Experian failed to follow procedures that it had previously agreed to in a 2008 class action settlement in the Central District of California regarding debts discharged in consumer bankruptcies (the "*White* Order").  She alleged that the inaccurate reporting prevented her from reestablishing her credit worthiness following

---

[1] Chapter 7 requires an individual debtor to transfer nearly all pre-petition assets to a bankruptcy court for liquidation and distribution to creditors.  In return, the debtor receives a "fresh start" when their past debts are discharged, and their post-petition income is shielded from pre-petition creditors.  *See generally Pollitzer v. Gebhardt*, 860 F.3d 1334, 1337 (11th Cir. 2017) (discussing the differences between Chapter 7 and Chapter 13 bankruptcy).

bankruptcy, resulted in a denial in obtaining a credit card, and caused her stress and anxiety concerning her past debts and her ability to establish new credit.

Experian filed an answer to the complaint on July 27, 2020, and the case proceeded to discovery in August 2020.  (Docs. 11, 15).  Discovery concluded in January 2021.  (*See* Docs. 29, 36).

On February 23, 2021, the parties filed cross-motions for summary judgment. (Docs. 48, 49).  They have each filed response and reply briefs on the issues before the Court.  (Docs. 52, 53, 54, 55).  After considering the parties' arguments, the relevant authority, and the record evidence, the undersigned finds that this matter is ripe for review.

**B. Material Facts[2]**

### i.   *The* White *Order*

In 2005, a group of consumers proceeding on behalf of a putative nationwide class sued the three major CRAs—Experian, Equifax Information Services, LLC ("Equifax"), and Trans Union, LLC ("Trans Union")—in the Central District of California, asserting that the defendants had failed to maintain reasonable

---

[2] For the purposes of summary judgment, the undersigned relies primarily on the parties' statements of material facts.  Where the parties do not dispute each other's statements with factual evidence or provide a legal basis to exclude opposing evidence, the undersigned treats those facts as admitted for the purposes of this Report and Recommendation.  *See* LR 56.1(B)(2)(a)(2), NDGa.

procedures to ensure the accurate reporting of debts that had been discharged in Chapter 7 bankruptcy. *See White v. Experian Info. Sols., Inc.*, Case No. 05-CV-1073, 2008 WL 11518799, at *1 (C.D. Cal. Aug. 19, 2008). In August 2008, the parties entered into an approved settlement agreement "incorporating new procedures that make use of assumptions regarding the likely discharged status of certain pre-bankruptcy tradelines." *Id.* at *3. The *White* court certified the class of plaintiffs as all consumers who had active credit files with the defendants prior to August 2008. *Id.* at *7 (defining the "23(b)(2) Settlement Class"). The *White* Order required the CRAs to update the credit reports for current class members, but it also mandated prospective relief for future consumers who had received a Chapter 7 bankruptcy discharge. *See id.* at *7–12.

The updated procedures for future consumers included the following. Experian was required to update each "pre-bankruptcy judgment, tradeline, or Collection Account" in a consumer's file "[w]ithin 60 days of adding a public record entry reflecting a Chapter 7 discharge to a Consumer's credit File." *Id.* at *9. For pre-bankruptcy tradelines that had been reported as open accounts, Experian "shall identify each tradeline . . . that is reported with a date opened that predates or is equal either to the month of or to the month prior to the Bankruptcy Date and is not

reported in the File as a Closed Account."[3]  *Id.* at *10.  For those tradelines, Experian agreed to "code the tradeline . . .to indicate that the account is discharged in the Consumer's Chapter 7 bankruptcy (e.g., by use of the terminology 'included in bankruptcy') and shall update the tradeline . . . to reflect a zero-dollar or blank account balance and past due balance as to the Consumer who received the bankruptcy discharge, so as to indicate that no debt is due or owing by the Consumer after the discharge date."  *Id.* at *4, *10.

The *White* Order recognized that there was a "statistical likelihood" that "certain categories of pre-bankruptcy consumer debts have been discharged . . . without either the affected creditors or Consumers reporting the debt to Defendants."  *Id.* at *13.  The Order also recognized that these procedures "will introduce some inaccurate, potentially harmful information onto the credit Files . . .of certain Consumers who would be subject to the new procedures on a

---

[3] The *White* Order defined "Bankruptcy Date" as "the months during which . . . a Consumer filed a bankruptcy petition that later led to a public record in the Consumer's File of the entry of a discharge order pursuant to Chapter 8."  *see also White*, 2008 WL 11518799, at *4.  It defined "Closed Account" as "an account is reporting with a zero balance and has a narrative or other code indicating any of the following: (a) that the account has been closed by a consumer or creditor; (b) that the account has a Current Status; (c) that the account has been transferred, sold, lost or stolen; (d) or that the account is an installment loan that has been paid in full."  *Id.* at *5.  The order also defined "Current Status" as "an account status or rating indicating that, as of the date of last reporting, there is no outstanding, overdue, and delinquent balance currently due."  *Id.*

prospective basis." *Id.* This information "may impair those Consumers' creditworthiness, including their ability to use pre-bankruptcy accounts that they may have intended to exclude from the bankruptcy discharge and their ability to obtain post-bankruptcy credit." *Id.* Despite that risk, the parties and the *White* court agreed that the updated procedures were reasonable, and the court concluded that they were "conclusively deemed to comply with the FCRA." *Id.* at *14.[4]

### i.   *Experian's Current Procedures*

Experian receives its information on consumer bankruptcies electronically from a third-party vendor, LexisNexis. (Def.'s Statement of Material Facts ("DSMF") ¶ 13, Doc. 49-1). LexisNexis provides information on consumer bankruptcy filings and discharges on either a daily or weekly basis. (Pl.'s Statement of Material Facts ("PSMF") ¶¶ 12–13, Doc. 48-1; *see also* Rogers Dep. at 9–10, Doc. 48-9; Rogers Decl. ¶ 7, Doc. 49-4).[5] When Experian receives notice of a bankruptcy discharge for a consumer, it performs an automated "scrub" of the

---

[4] Experian presents several filings in the *White* case that the undersigned has excluded here, such as briefs and argument before the court, to suggest that its procedures are reasonable. (*See, e.g.*, DSMF ¶ 16; Doc. 55 at 4). The undersigned has referred only to the *White* Order to determine the facts and considerations that were material to the settlement. Similarly, Plaintiff has attempted to submit pleadings from other cases as evidence to support her position, which the undersigned has excluded as immaterial. (*See, e.g.*, Doc. 52-9 ¶¶ 23, 25).

[5] For reference, the undersigned uses the pagination reflected on CM/ECF to refer to non-testimonial evidence before the Court.

consumer's credit file to clear discharged debts, which then reflect the discharge and a $0 balance.  (DSMF ¶ 14).  A debt qualifies for the scrub if it (1) it has an opening date before filing of the consumer's bankruptcy petition, (2) its status is not finalized (e.g., closed or paid off), *and* (3) the account was delinquent by more than 90 days as of the date of the scrub.  (DSMF ¶ 15).  Experian's stated purpose for the 90-day delinquency threshold is to distinguish "consumers who have fallen behind on a debt but intend to catch up from those who have stopped paying a debt and are treating it as discharged." (Rogers Decl. ¶ 16, Doc. 49-4).  If a creditor independently informs Experian that a debt is discharged in bankruptcy, Experian will also update the consumer's file to reflect a $0 balance and the discharge.  (*Id.* ¶ 21).

Every other month after the discharge, Experian performs a second scrub— which it calls a "look-back scrub"—that updates reported debts from the preceding 18 months that the initial scrub may have missed.  (*Id.* ¶¶ 19-20).  For instance, if an account was open at the time of a consumer's discharge but the consumer had made timely payments on the debt, then only the look-back scrub would update the trade line in the consumer's credit file.  Sometime after the events of this case, Experian updated its procedures so that the initial scrub includes accounts that are delinquent

7

by only 30 days.[6]  (Doc. 52-7).  Experian also changed the look-back scrub to run

every month, instead of every two months.  (Rogers Decl. ¶ 19, Doc. 49-4).

### ii.     The MoneyLion Account & Plaintiff's Chapter 7 Bankruptcy

In August 2019, Plaintiff received a secured loan of $1,000 from MoneyLion,

Inc., with $500 provided to her in cash and $500 set aside as collateral for the

Account.  (DSMF ¶¶ 26–28, Doc. 49-1).  On September 27, 2019, Plaintiff filed a

petition for voluntary bankruptcy in the U.S. Bankruptcy Court for the Northern

District of Georgia, pursuant to Chapter 7 of Title 11 of the Bankruptcy Code.

(PSMF ¶ 1, Doc. 48-1); *see also In re Charlynda Benjamin*, No. 19-65334-lrc

(Bankr. N.D. Ga. Sept. 28, 2019) ("Bankr. Dkt."), Doc. 1.  The bankruptcy court

entered a general discharge order in Plaintiff's case on January 13, 2020.  (Bankr.

Dkt., Doc. 12).

---

[6] Experian asks the Court to disregard evidence of its updated procedures as "irrelevant and inadmissible" because (1) Plaintiff's counsel attempted to offer it through her own testimony without personal knowledge and (2) Experian may have made this statement through counsel during settlement negotiations.  (Doc. 55 at 1 n.1 (citing Fed. R. Evid. 408)).  Experian has not provided any factual basis to assert that this information was learned only through settlement negotiations, and in an e-mail from Experian's own counsel describing the changes, there is nothing for the Court to conclude that it was disclosed in that setting.  (Doc. 52-7); *see* Fed. R. Evid. 408.  Experian also does not dispute the factual accuracy of this information, and the evidence would almost certainly be reducible to admissible form at trial through a Rule 30(b)(6) witness.  *See Rowell v. BellSouth Corp.*, 433 F.3d 794, 800 (11th Cir. 2005) (stating that inadmissible evidence may be considered at summary judgment, as long as it can be reduced to an admissible form at trial).  Therefore, the undersigned declines to exclude these facts and discusses their relevance below.

For September and October 2019, MoneyLion reported to Experian that the Account was current.[7]  (DSMF ¶ 33).  MoneyLion's records reflect that Plaintiff's first delinquency on the Account occurred on November 2, 2019, and it reported a delinquency for November 2019, December 2019, and January 2020.  (Doc. 52-3).  However, Plaintiff made at least one payment on the Account sometime around December 2019 or January 2020.  (DSMF ¶ 34; Doc. 52-3 at 2).  In March 2020, MoneyLion reported to Experian that the Account was delinquent by 60 days.  (DSMF ¶ 35; *see* Doc. 48-6 at 3).  In April 2020, Experian reported that the Account had been placed in collections.  (Doc. 48-6 at 3).

Experian's initial scrub executed on or about January 20, 2020, which updated several tradelines to reflect Plaintiff's bankruptcy and a $0 balance.  (Rogers Decl. ¶ 28, Doc. 49-4).  Experian's look-back scrub likely executed on June 1, 2020, and updated the Account to reflect that it had been discharged in bankruptcy.  (*Id.*; Rogers 2d Decl. ¶¶ 12-14; Doc. 53-4; Rogers Dep. at 44–45, Doc. 48-9).

---

[7] Plaintiff disputes this fact based on her interpretation of "Current Status" as reflected in the *White* Order.  (*See* Doc. 52-9 ¶ 33).  The *White* Order defined "Current Status" as "an account status or rating indicating that, as of the date of last reporting, there is no outstanding, overdue, and delinquent balance currently due." *White*, 2008 WL 11518799, at *5.  However, Plaintiff misreads the definition by effectively substituting "or" for "and."  A plain reading of the *White* court's definition means that an account is current if there is not an overdue or delinquent balance.  In other words, if a consumer misses a due date for payment of a debt, an account is not current, but if there is an outstanding (but not overdue) payment, then the account is current.

In May 2020, Plaintiff obtained a copy of her credit reports from all three CRAs. (PSMF ¶ 3). Plaintiff's Equifax and Trans Union credit reports showed that the Account had been included in her bankruptcy and did not reflect an outstanding balance. (Doc. 48-7 at 4; Doc. 48-8 at 3). However, her Experian report reflected that the Account was a "Secured Loan" with an outstanding balance of $330 as of April 2020 and a past-due amount of $139. (Doc. 48-6 at 3). It also reflected the delinquencies in payment for December 2019 to March 2020 as well as its collections status in April 2020. *Id.* Although the report showed that other debs, such as an account with Wakefield & Associates, were discharged in bankruptcy, the report did not indicate anywhere that the instant Account had been discharged. *Id.* The report also contained a public records line showing her September 2019 bankruptcy filing and January 2020 discharge date. (*Id.* at 2).

Plaintiff obtained a second credit report from Experian on July 10, 2020. (Doc. 49-13). Her July report did not report any balance for the Account and indicated that it was "[d]ischarged through Bankruptcy Chapter 7/Never late." (*Id.* at 3). The undersigned supplements these facts below, where relevant to the issues before the Court at summary judgment.

## II.    SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56(a), the Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is any fact that "is a legal element of the claim under the applicable substantive law which might affect the outcome of the case." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997). A genuine dispute exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When evaluating the merits of a motion for summary judgment, the court must "view the evidence and all factual inferences raised by it in the light most favorable to the non-moving party, and resolve all reasonable doubts about the facts in favor of the non-moving party." *Comer v. City of Palm Bay, Fla.*, 265 F.3d 1186, 1192 (11th Cir. 2001).

A party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion." *Celotex Corp v. Catrett*, 477 U.S. 317, 323 (1986). A moving party meets this burden merely by "'showing'— that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

If the moving party provides a basis for summary judgment, the nonmoving party must respond with record evidence showing a genuine dispute, as mere

conclusions and unsupported statements by the nonmoving party are insufficient. *Id.* at 324; *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005). Similarly, "[s]peculation or conjecture cannot create a genuine issue of material fact." *S.E.C. v. Monterosso*, 756 F.3d 1326, 1333 (11th Cir. 2014). "[A] plaintiff's failure to support an essential element of her case renders all other facts immaterial and requires the court to grant summary judgment for the defendant." *Celotex Corp.*, 477 U.S. at 322–23.

## A. Evidentiary Objections

### i. *Declaration of Cymone Rogers*

Before discussing the merits of Plaintiff's claim, the undersigned addresses two pending evidentiary issues. First, Plaintiff asks the Court to strike the declaration of Cymone Rogers as a "sham affidavit" that is inconsistent with her prior deposition testimony.[8] (Doc. 52 at 2–4).

---

[8] Plaintiff also appears to argue that Rogers's declaration should be disregarded because it was "submitted approximately two months after the close of discovery, contains opinions stated as definitive truths, and does not cite to documents, records, etc." (Doc. 52 at 2 n.2). To the extent that Plaintiff challenges the timeliness of the declaration, there is no basis under the Federal Rules of Civil Procedure to strike it. *See Pods Enters., Inc. v. U-Haul Int'l, Inc.*, No. 8:12-cv-01479-T-27MAP, 2014 WL 12630066, at *1 (M.D. Fla. June 18, 2014) ("There is nothing improper about filing undisclosed affidavits in opposition to a motion for summary judgment as long as the affiants have been disclosed as potential witnesses."); *Pac. Atl. Lines, Inc. v. Jah*, No. 1:09-cv-96250-TCB, 2011 WL 13175441, at *6 (N.D. Ga. Feb. 11, 2011) (disapproving of a party's submission of declarations after the close of discovery but noting that there was no authority prohibiting the practice).

"The purpose of summary judgment is to separate real, genuine issues from those which are formal or pretended." *Tippens v. Celotex Corp.*, 805 F.2d 949, 953 (11th Cir. 1986).  Because parties may try to escape summary judgment by using affidavits to create disputes on the material facts, the Eleventh Circuit also allows an affidavit to be disregarded as a "sham" if it is inconsistent with earlier deposition testimony in a manner than cannot be explained.  *Van T. Junkins & Assoc. v. U.S. Indus.*, 736 F.2d 656, 657 (11th Cir. 1984) ("When a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony.").  However, courts must carefully apply the sham affidavit rule because "every discrepancy contained in an affidavit does not justify a district court's refusal to give credence to such evidence." *Tippens*, 805 F.2d at 954 (alterations, quotation marks, and citations omitted).  "A definite distinction must be made between discrepancies which create transparent shams and discrepancies which create an issue of credibility or go to the weight of the evidence." *Id.* at 953.  Where an affidavit conflicts with these rules, the Court may disregard the improper testimony at summary judgment and consider the remaining statements. *Haynes v. Twin Cedars Youth & Family Servs.*, No. 5:10-cv-00321 (CAR), 2012 WL 895699, at *5 (M.D. Ga. Mar. 15, 2012) (citing *Lee v. Nat'l Life Assurance Co. of Canada*, 632 F.2d 524, 529 (5th Cir.

1980)); *Brassfield v. Jack McLendon Furniture, Inc.*, 953 F. Supp. 1424, 1430 (M.D. Ala. 1996) ("Only those affidavit statements which are inherently inconsistent with earlier deposition testimony should be stricken." (quotation marks and citations omitted)).

Here, Plaintiff asserts that there are discrepancies in Rogers's testimony, but the only discrete instance of inconsistencies that Plaintiff identifies are either explained in the record or are immaterial to the parties' motions for summary judgment. For instance, Plaintiff argues that Rogers's statements in her declaration regarding when the look-back scrub executed for her credit file are inherently inconsistent with her deposition testimony. Rogers testified in her deposition that "We can see that [MoneyLion] was still reporting collections after [] April 2020, as well as we can we that the account was included in bankruptcy more than likely on June 1st, 2020." (Rogers Dep. at 44–45, Doc. 49-11). When Plaintiff's counsel asked for clarification on why it was included in bankruptcy in June, Rogers explained that "The June 1st [date] correlates with the same time that the bankruptcy look-back scrub [] ran." (*Id.* at 45). Rogers further explained that, although MoneyLion still reported that the account had been sent to collections, "Experian suppresses the information so that it does not show on the credit report."[9] *Id.*

---

[9] When an account is suppressed, it still exists within the consumer's Experian credit file, but the account is not reported to the consumer or third parties. (*See* Rogers Dep. at 30, Doc. 48-9).

14

In her declaration, Rogers stated that "MoneyLion reported that the account was in collections" and that "Experian's secondary scrub executed on June 1, 2020 and updated Plaintiff's MoneyLion account based on the Collection status to report as discharged in bankruptcy." (Rogers Decl. ¶¶ 28–29, Doc. 49-4). She added that MoneyLion informed Experian of the Account's discharged status in January 2021. (*Id.* ¶ 30).

These statements are not so inherently inconsistent that they create a "transparent sham," but instead, they appear to supplement or correct prior testimony. *See Croom v. Balkwill*, 672 F. Supp. 2d 1280, 1286 (M.D. Fla. 2009) (stating that the court generally will not strike an affidavit if it supplements earlier testimony, presents a variation of testimony, or represents instances of failed memory); *see also Tippens*, 805 F.2d at 954 ("Variations in a witness's testimony and any failure of memory throughout the course of discovery create an issue of credibility[.]"). That distinction is especially important here, as Rogers testified under Rule 30(b)(6) on behalf of the corporation itself, not directly from her personal knowledge of key events. For instance, Rogers's second affidavit states that she "mistakenly testified that . . . LexisNexis [] provides information about consumer bankruptcies on a weekly basis," when in fact Experian receives it daily. (Rogers 2d Decl. ¶ 7, Doc. 53-4). She also changed her prior testimony that Experian's automated scrub triggered when it received notice of both a bankruptcy petition

filing and the discharge, stating that the scrub occurred only with notice of the latter. (*Id.* ¶ 8). For the most part, these minor inconsistencies do not change much about the fate of this case. However, even if Rogers's statements were flatly contradictory on material issues, the undersigned would not choose to strike the entire affidavit instead of merely disregarding the directly inconsistent testimony. *See Haynes*, 2012 WL 895699, at \*5; *Brassfield*, 953 F. Supp. at 1430. Accordingly, Plaintiff's objection to Rogers's declaration is **OVERRULED**.

### ii. *Motion to Strike*

Second, Experian moves to strike the deposition transcript of Joy Allison, an Experian employee that testified in a separate matter. (Doc. 57). As background, Plaintiff attached the testimony as evidence in support of her reply brief, arguing that the testimony establishes that Experian sent information related to the Account to a third party. (*See* Doc. 54 at 9; Doc. 54-5). However, based on the undersigned's analysis of this issue below, Ms. Allison's testimony is unnecessary because Plaintiff can satisfy the third-party disclosure requirement under Section 1681e(b) without it. Accordingly, the Motion to Strike is **DENIED** as moot.

## III. DISCUSSION

### A. Arguments

In support of her motion for partial summary judgment, Plaintiff asserts that the undisputed evidence shows that Experian was negligent in implementing

reasonable procedures to ensure the maximum possible accuracy of her credit report under 15 U.S.C. § 1681e(b).  (Doc. 48-2).  She argues that Experian's procedures fail to ensure that it accurately reports consumers' discharged debts after a bankruptcy, rendering it liable as a matter of law, and that it did so particularly for the Account.  (*Id.* at 14–19).  Plaintiff further argues that this violation damaged her ability to access credit following her bankruptcy and caused emotional distress, mental pain, and anguish, based on her deposition testimony.  (*Id.* at 19–22).

Experian first argues that the *White* Order precludes Plaintiff's claim under 15 U.S.C. § 1681e(b) because it previously litigated the reasonableness of its bankruptcy-reporting procedures—the same procedures that Plaintiff challenges here—and agreed to a court-approved settlement with the *White* plaintiffs. (Doc. 49-2 at 11–16).  It argues that, regardless of the potential estoppel effect of the *White* Order, its current procedures exceed the requirements mandated in that case, which establishes their reasonableness.  (*Id.* at 20–21).

As to the facts underlying Plaintiff's particular claim, Experian argues that (1) Plaintiff's credit file was accurate and (2) she cannot establish that any particular discrepancy with the Account was actually sent to a third party, a necessary prerequisite to a Section 1681e(b) claim.  (*Id.* at 23–24; Doc. 53 at 2–7).  It further asserts that, even if there was an inaccuracy, its reliance on MoneyLion's reporting of the Account was reasonable, and it did not have sufficient notice that the Account

had been discharged in bankruptcy. (Doc. 49-2 at 17–19). Finally, Experian argues that Plaintiff has not presented any evidence of actual damages. (*Id.* at 21–23; Doc. 53 at 7–12).

First, the undersigned addresses the estoppel effect of the *White* Order. Then, proceeding to the merits of Plaintiff's Section 1681e(b) claim, the undersigned discusses whether (1) whether Experian disclosed the Account inaccurately to a third party, (2) whether Plaintiff has provided sufficient evidence of damages under the FCRA, and (3) whether Experian's procedures are reasonable as a matter of law.

## B. Collateral Estoppel & the *White* Order

A central issue in this litigation is whether the *White* settlement precludes Plaintiff's claim under Section 1681e(b). Experian argues that it does, as Experian extensively litigated and negotiated a class-action settlement with plaintiffs in a similar position as Plaintiff here. (Doc. 49-2 at 9–15; Doc. 52 at 7–11). In response, Plaintiff argues, first, that Experian cannot assert a defense of collateral estoppel because it did not include that ground in its answer and, second, that the *White* Order is not binding upon this Court. (Doc. 52 at 6–10). As to the second argument, Plaintiff asserts that other courts have rejected Experian's identical arguments in similar litigation, that Experian's interpretation of the *White* Order conflicts with regulations promulgated by the Federal Trade Commission ("FTC"), and that the *White* Order's terms foreclose Experian's argument. *Id.*

After the parties concluded briefing in this case, they each submitted supplemental authority to support their positions on the *White* Order. (Docs. 63, 65). Experian submitted three cases from the Central District of California, in which the same court that approved the *White* settlement concluded that the Order precluded subsequent litigation in the same district. *See Wheeler v. Trans Union LLC*, No. 2:20-cv-11710-DOC-RAO, 2021 WL 2290575 (C.D. Cal. June 4, 2021); *Hernandez v. Experian Info. Sols.*, No. 2:20-cv-09908-DOC-RAO, 2021 WL 2325019 (C.D. Cal. June 4, 2021); *Sunseri v. Experian Info. Sols.*, No. 2:20-08932-DOC-RAO, 2021 WL 2327934 (C.D. Cal. June 4, 2021). In turn, Plaintiff submitted a Report and Recommendation from Magistrate Judge Linda Walker in a similar case before this Court as supplemental authority. *See Njie v. Experian Info. Sols., Inc.*, No. 1:20-cv-04735-JPB-LTW (N.D. Ga. June 25, 2021), Doc. 41, *adopted by* Doc. 43.

Putting aside Plaintiff's argument that Experian failed to plead collateral estoppel as a defense, the undersigned has reviewed the cases presented and finds Judge Walker's analysis of the *White* Order persuasive.[10] Without reciting the

---

[10] The undersigned notes that Experian presented substantively identical arguments before Judge Walker that it does here. (*Compare Njie v. Experian Info. Sols., Inc.*, No. 1:20-cv-04735-JPB-LTW, Doc. 20-1 at 12–16 (citing, *inter alia*, *Riddick ex rel. Riddick ex rel. Riddick v. Sch. Bd. of City of Norfolk*, 784 F.2d 521 (4th Cir. 1986); *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 282 n.51 (3d Cir. 2014); *LeClair v. Mass. Bay Trans. Auth.*, 300 F. Supp. 3d 318 (D. Mass. 2018), *with* Doc. 49-2 at 11–15 (citing the same))).

entirety of Judge Walker's well-reasoned discussion, the undersigned summarizes the relevant considerations here briefly.

> Collateral estoppel or issue preclusion forecloses relitigation of an issue of fact or law that has been litigated and decided in a prior suit. There are several prerequisites to the application of collateral estoppel: (1) the issue at stake must be identical to the one involved in the prior litigation; (2) the issue must have been actually litigated in the prior suit; (3) the determination of the issue in the prior litigation must have been a critical and necessary part of the judgment in that action; and (4) the party against whom the earlier decision is asserted must have had a full and fair opportunity to litigate the issue in the earlier proceeding.

*I.A. Durbin, Inc. v. Jefferson Nat'l Bank*, 793 F.2d 1541, 1549 (11th Cir. 1986). "Collateral estoppel . . . has the dual purpose of protecting litigants from the burden of relitigating an identical issue with the same party or his privy and of promoting judicial economy be preventing needless litigation." *Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 326 (1979) (citation omitted).

The Supreme Court has abandoned the requirement of mutuality between the parties with respect to collateral estoppel. *See Allen v. McCurry*, 449 U.S. 90, 94–95 (1980) (citations omitted). "But one general limitation the Court has repeatedly recognized is that the concept of collateral estoppel cannot apply when the party against whom the earlier decision is asserted did not have a 'full and fair opportunity' to litigate that issue in the earlier case." *Id.* at 95. Thus, the Court has emphasized a fundamental rule that "[a] court's judgment binds only the parties to a suit, subject

to a handful of discrete and limited exceptions." *Smith v. Bayer Corp.*, 564 U.S. 299, 313 (2011).

In the class action context, a judgment only binds members of a certified class. *Taylor v. Sturgell*, 553 U.S. 880, 884 (2008). However, as mentioned, there are several "discrete and limited exceptions" to the general rule, and a plaintiff who is not a member of a class in a previously litigated case may still be bound if she was "adequately represented" by the interests of that class. *Id.* at 900. "A party's representation of a nonparty is 'adequate' for preclusion purposes only if, at a minimum: (1) The interests of the nonparty and her representative are aligned; and (2) either the party understood herself to be acting in a representative capacity or the original court took care to protect the interests of the nonparty." *Id.* (citations omitted).

Here, Plaintiff was not a party to the *White* litigation, and the terms of the *White* Order excluded Plaintiff as a member of the class. *See White*, 2008 WL 11518799, at *7. As Judge Walker found, Experian was a party to the *White* settlement, but Plaintiff was not, foreclosing her ability to litigate the reasonableness of Experian's procedures fully and fairly. *See Allen*, 449 U.S. at 95. Experian acknowledges Plaintiff's status as a non-member of the *White* class but argues nonetheless that the class "functionally [] also includes consumers like Plaintiff who are discharged from bankruptcies in the future." (Doc. 55 at 9). However, this

theory is heavily disfavored under federal common law.  *See Taylor*, 553 U.S. at 896–04; *E.E.O.C. v. Pemco Aeroplex, Inc.*, 383 F.3d 1280, 1286–90 (11th Cir. 2004) (noting that "'privity' is a flexible legal term" but concluding, in relevant part, that the defendant failed to show that the plaintiff was in privity with prior litigants under a theory of "virtual representation").

To the extent that Experian argues that Plaintiff was adequately represented in the *White* litigation, the undersigned disagrees for the reasons provided by Judge Walker: mainly, that the *White* Court explicitly excluded plaintiffs whose bankruptcies were discharged after the settlement was approved.  *See* 2008 WL 11518799, at *7 (defining the class as "all Consumers whose credit Files include a Discharge Date prior to the month of the Approval Date").  Experian cites to subsequent cases in the Central District of California finding that the *White* Order is binding on future, non-class members, but it does not adequately address the developing authority concluding the opposite.  *See Morris v. Experian Info. Sols., Inc.*, 478 F. Supp. 3d 765, 771 (D. Minn. 2020); *Alsibai v. Experian Info. Sols.*, 488 F. Supp. 3d 840, 847 (D. Minn. 2020) (citing *Morris*); *Peterson v. Experian Info. Sols., Inc.*, ___ F. Supp. 3d ___, No. 20-606(DSD/ECW), 2021 WL 2326990, at *3 (D. Minn. Jan. 25, 2021) (citing *Morris* and *Alsibai*); *Gibson v. Experian Info. Sols., Inc.*, 494 F. Supp. 3d 613, 617 (E.D. Mo. 2020).  Accordingly, following other courts' lead, the undersigned concludes that the *White* Order does not preclude

Plaintiff from challenging the reasonableness of Experian's procedures here.  Even so, the *White* Order "may nevertheless be instructive regarding the reasonableness of Experian's procedures and reporting." *Peterson*, 2021 WL 2326990, at *3.

### A. 15 U.S.C. § 1681e(b)

Section 1681e(b) of the FCRA requires a CRA preparing a "consumer report" to "follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."  15 U.S.C. § 1681e(b).  To establish a *prima facie* violation of Section 1681e(b), a consumer must present evidence that (1) a credit reporting agency's "consumer report" contained factually inaccurate information, (2) that the procedures it took in preparing and distributing the report were unreasonable, and (3) that damages followed as a result. *Losch v. Nationstar Mortg. LLC*, 995 F.3d 937, 944 (11th Cir. 2021) (citing *Cahlin v. Gen. Motors Acceptance Corp.*, 936 F.2d 1151, 1157, 1160 (11th Cir. 1991); *Nagle v. Experian Info. Sols., Inc.*, 297 F.3d 1305, 1307 (11th Cir. 2002)).

The FCRA defines a "consumer report" as "any written, oral, or other communication of any information by a [CRA] bearing on a consumer's credit worthiness, credit standing, [or] credit capacity . . . which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for [credit]."  15 U.S.C. § 1681a(d)(1).

Therefore, unlike violations under other provisions of the FCRA, a violation of Section 1681e(b) concerns only information communicated about a consumer to a third party. *Collins v. Experian Info. Sols., Inc.*, 775 F.3d 1330, 1335 (11th Cir. 2015).

The Eleventh Circuit has recently adopted a definition of "maximum possible accuracy" that requires CRAs' information to be "factually true and also unlikely to lead to a misunderstanding." *Erickson v. First Advantage Background Servs. Corp.*, 981 F.3d 1246, 1252 (11th Cir. 2020). This definition requires courts to "look to the objectively reasonable interpretations of the report." *Id.*

### i. Plaintiff's Report Was Inaccurate

Before proceeding to the merits of Experian's procedures, a few preliminary matters must be addressed. First, Plaintiff has not presented direct evidence that a "consumer report," as defined under the FCRA, contained an inaccuracy because the credit report that she relies upon was provided to her, not a third party. (*See* Doc. 48-6). Experian notes as much to argue that it never disclosed any inaccurate information. (*See* Doc. 49-2 at 23–24). However, the Court can infer from that credit report and the fact that at least two creditors made hard inquiries on February 5, 2020, and January 31, 2020—which was after Plaintiff's bankruptcy discharge and before Experian updated the Account—that the disputed tradeline may have been sent to a third party. (*See* Doc. 48-6 at 5); *Losch v. Nationstar Mortg.*

*LLC*, 995 F.3d 937, 943 (11th Cir. 2021) (concluding that, at summary judgment, "evidence of inquiries on [the plaintiff's] credit report is sufficient to show that the report was sent to third parties"). A reasonable jury could conclude that, for either of these inquiries, Experian's disclosures more likely than not showed the Account.

Next, the parties dispute whether the report was inaccurate as a factual matter, but there is little doubt that it was. Experian argues at various points that there is no way to know whether the Account was discharged as part of Plaintiff's bankruptcy, pointing to the possibility that Plaintiff's debt was non-dischargeable and that the Account was not listed in Plaintiff's bankruptcy petition. (Doc. 49-2 at 18 n.3; Doc. 53 at 5–6). However, the basic principles of bankruptcy suggest otherwise.

In a Chapter 7 bankruptcy, a debtor receives a general discharge from her liabilities and the bankruptcy court's order enjoins creditors from collecting discharged debts, subject to enumerated exceptions.[11] *See* 11 U.S.C. § 727(b) ("[A] discharge . . . discharges the debtor from all debts that arose before the date of the order for relief under this chapter[.]"); 11 U.S.C. § 523 (listing the exceptions to discharge); *Medley v. Dish Network, LLC*, 958 F.3d 1063, 1067 (11th Cir. 2020) ("When a Chapter 7 debtor receives a discharge, she is discharged from all debts and

---

[11] Historically, a bankruptcy court did not determine the legal effect of a general discharge, leaving the matter to other federal courts who considered complaints implicating the effect of a discharge on particular debts. *See In re Wright*, 7 B.R. 197, 197 & n.1 (Bankr. N.D. Ala. 1980).

'any liability on a claim' that arose, or are determined to arise, before the bankruptcy is filed." (quoting 11 U.S.C. § 727(b))); *In re St. Laurent*, 991 F.2d 672, 680 (11th Cir. 1993) (stating that the bankruptcy code's general policy requires exceptions to discharge to be construed strictly against creditors and in favor of an honest debtor).

As to whether the Account was actually discharged, Experian argues that Plaintiff's debt may not be dischargeable as a loan for a luxury good,[12] but there is no evidence that Plaintiff used the money related to the Account to purchase any luxury good or service. The only record evidence on this point came from Plaintiff's testimony, and she stated that she did not remember the reason for the debt. (Benjamin Dep. at 24, Doc. 48-11). Therefore, Experian's argument is entirely speculative. *See Glassco v. City of Argo*, 903 F.3d 1207, 1213 (11th Cir. 2018) ("Conclusory allegations and speculation are insufficient to create a genuine issue of material fact."). Moreover, there is no "presumption of non-dischargeability" for a debt as Experian claims. (Doc. 53 at 5). If anything, there is a presumption in favor of discharge, not the other way around. *See St. Laurent*, 991 F.2d at 680.

Accordingly, the undersigned finds that—for the period from the bankruptcy court's discharge order until it listed the debt as discharged sometime in or around June 2020—Experian's credit file for Plaintiff was inaccurate as to the Account. *See*

---

[12] Experian mistakenly cites "11 U.S.C. § 523(C)(i)(I)" but the applicable section is 11 U.S.C. § 523(a)(2)(C)(i)(I).

*Losch*, 995 F.3d at 945 (concluding that a report was inaccurate because it "didn't just report the existence of a debt but also the balance that [the plaintiff] owed, the amount was [] was past due, and how long [it] was past due"). But that is not the end of the matter because Section 1681e(b) imposes liability for failing to maintain "reasonable procedures" to ensure maximum possible accuracy, not the inaccuracy itself.

### ii.    *Plaintiff Has Presented Sufficient Evidence of Damages*

The FCRA provides separate remedies for negligent and willful violations of its requirements. *See* 15 U.S.C. §§ 1681n, o. If a plaintiff establishes that the defendant willfully violated the FCRA, she "may elect to receive actual damages *or* statutory damages, but not both," in addition to punitive damages, costs of the litigation, and reasonable attorney's fees.[13] *Harris v. Mexican Specialty Foods, Inc.*, 564 .3d 1301, 1313 (11th Cir. 2009) (citing 15 U.S.C. § 1681n(a)) (emphasis in original). However, a plaintiff who establishes a negligent violation of the FCRA is entitled only to actual damages, as well as attorney's fees and costs. 15 U.S.C. § 1681o(a). Therefore, unless the plaintiff shows a willful violation, the "failure to produce evidence of damage resulting from a FCRA violation mandates summary judgment." *Nagle v. Experian Info. Solutions, Inc.*, 297 F.3d 1305, 1307 (11th Cir.

---

[13] As explained below, Plaintiff has not presented any evidence suggesting a willful violation of the FCRA, meaning that she cannot pursue statutory damages. Therefore, proof of actual damages is required.

2002); *King v. Asset Acceptance, LLC*, 452 F. Supp. 2d 1272, 1280 (N.D. Ga. 2006) ("Damages are an element of the claim and without evidence of damages, summary judgment is appropriate.").

As a general matter, "[a] non-conclusory affidavit which complies with [Federal Rule of Civil Procedure 56] can create a genuine dispute concerning an issue of material fact, even if it is self-serving and/or uncorroborated." *United States v. Stein*, 881 F.3d 853, 858–59 (11th Cir. 2018) (*en banc*); *see* Fed. R. Civ. P. 56(c)(4) (requiring an affidavit to be "made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.").   In *Losch v. Nationstar Mortgage LLC*, the Eleventh Circuit discussed what injury a plaintiff must suffer to have standing to assert an FCRA violation, which, in turn, informs what damages a plaintiff must show under Sections 1681n and 1681o.  995 F.3d 937, 942–44 (11th Cir. 2021).  In that case, the plaintiff also asserted a negligent and willful violation of Section 1681e(b) related to the reporting of a debt after his Chapter 7 bankruptcy. *Id.* at 941.

The Eleventh Circuit concluded that the plaintiff need not show that false reporting negatively impacted his credit score to assert an injury-in-fact, because the inaccuracy was an injury in-and-of-itself.  *Id.* at 943 ("[T]he injury isn't the one to his credit score, but rather, the false reporting about his debt.").  It went on to find

that the plaintiff had shown a "concrete injury in the form of the emotional distress and time he spent contesting the inaccurate information." *Id.*  As to the issue of damages under the FCRA, the court similarly concluded that *Stein* foreclosed the defendant's argument that the plaintiff's self-serving affidavit could not show emotional damages. *Id.* at 944.  The court found that the plaintiff's statements about "stress, anxiety, and lack of sleep" were not conclusory and were entitled to a presumption of truth at summary judgment, which raised a jury question about damages. *Id.*

  *Losch* and *Stein* control here.   As in *Losch*, Plaintiff has provided non-conclusory testimony that she suffered stress, anxiety, and a loss of sleep over the inaccuracy.  Plaintiff testified that she was "a little irritated because . . . [she] had just paid all this money for the bankruptcy" and she assumed that "everything would be straight" afterwards.  (Benjamin Dep. at 33, Doc. 48-11).  She stated, "[O]nce everything was discharged, and to see it put back on my credit report, it felt more like a set back.  Like, okay, here we go again.  You know, I did my part, and now we're back where we started." *Id.*  Plaintiff also testified that she was "angry" and lost a few nights' worth of sleep because she "didn't know the impact that [the inaccuracy] would have . . . on everything that [she] was trying to do." (*Id.* at 67–68).  Following *Losch*, these allegations are sufficiently detailed to constitute evidence of actual damages under 15 U.S.C. § 1681e(b).  Accordingly, the Court

need not address whether the inaccurate reporting led directly to the denial of future credit opportunities.

### iii.   *Reasonableness of Experian's Reporting Procedures*

Proceeding to the merits of the critical issue before the Court—the reasonableness of Experian's procedures—the parties present several arguments in support of their positions.   Plaintiff asserts that Experian's initial scrub uses an unreasonable set of criteria to designate pre-bankruptcy debts that are later discharged, and she asserts that the period of inaccuracy for the Account is evidence that Experian's scrub procedures are inadequate.   (Doc. 48-2 at 16; Doc. 52 at 15–21).   Plaintiff further notes that Experian accurately reported her other discharged debts, that her Trans Union and Equifax reports did not contain the same inaccuracy, and that Experian subsequently updated its scrub procedures.   (Doc. 54 at 11, 15).

She also points to guidance from the FTC, which reflects the general principle that discharged debts should be reported to reflect a bankruptcy and a consumer's non-obligation for each debt.[14]   (Doc. 48-2 at 17–18; Doc. 52 at 16–17; Doc. 54 at

---

[14] Plaintiff cites to the Appendix of 16 C.F.R. pt. 600, which previously contained the FTC's interpretations of the FCRA, but it was rescinded in 2011 after the Congress transferred the authority to issue interpretive guidance under the FCRA to the Consumer Financial Protection Bureau.   *See* Statement of General Policy or Interpretation; Commentary on the Fair Credit Reporting Act, 76 Fed. Reg. 44462 (July 26, 2011).   The undersigned has not been able to locate any similar guidance from the Consumer Financial Protection Bureau.   *See generally* Fair Credit Reporting (Regulation V), 12 C.F.R. pt. 1022.   In any event, the cited portions of the rescinded guidance are minimally persuasive, as they recognize only the broad

11–12).  Plaintiff urges the Court to apply a default rule that, in the absence of any explicit notice that a debt is not discharged in a Chapter 7 bankruptcy, all pre-petition debts should be reflected as discharged in a credit report.  (Doc. 54 at 12–-13).

For its part, Experian relies largely on its compliance with the *White* Order as the basis for its procedures, and it represents that its look-back scrub procedure exceeds those requirements by continuing to monitor consumers' credit files for likely-discharged debts that might have been missed.  (*See* Doc. 49-2 at 20–21; Doc. 53 at 13–15).  Experian also notes the uncertainty surrounding the Account itself, as Plaintiff made at least one payment after she had filed her bankruptcy petition.  (Doc. 53 at 6).  In response, Plaintiff argues that her payment on the Account after she had filed for bankruptcy should have no bearing on Experian's reporting because, regardless of her voluntary payment, she was no longer obligated for the debt.  (Doc. 54 at 7–8).  However, Experian argues that the information is still relevant, as some debtors may continue to maintain pre-petition debts after their bankruptcy—for instance, to establish new credit.  (Doc. 55 at 4).

The Eleventh Circuit has not extensively developed the meaning of the term "reasonable" under Section 1981e(b), but it has recently provided some guidance on

---

principles pertaining to discharged debts under the FCRA and are not particularly instructive to evaluating the reasonableness of the scrub procedures here.

this issue.  *Losch*, 995 F.3d at 945.  As the Eleventh Circuit concluded in *Losch*, two

principles guide the careful balance that courts must strike in applying the FCRA:

> First, a reporting agency's procedures will not be deemed unreasonable
> unless the agency has a reason to believe that the information supplied
> to it by a data furnisher is unreliable.  Because lenders report many
> millions of accounts to Experian daily, requiring it to examine each
> report individually for errors would be unduly costly.  But on the flip
> side of the same coin, when a credit reporting agency has been notified
> of potentially inaccurate information in a consumer's credit report, it is
> in a very different position than one who has no such notice.  That's
> because once a claimed inaccuracy is pinpointed, a consumer reporting
> agency conducting further investigation incurs only the cost of
> reinvestigating that one piece of disputed information.

*Id.* (citations, quotation marks, and alterations omitted).

As other circuits have noted, errors in a consumer's credit report may appear

even if the CRA uses reasonable procedures to ensure maximum possible accuracy.

*See Sarver v. Experian Info. Sols.*, 390 F.3d 969, 972 (7th Cir. 2004) ("One can

easily see how, even with safeguards in place, mistakes can happen. But given the

complexity of the system and the volume of information involved, a mistake does

not render the procedures unreasonable."); *Henson v. CSC Credit Servs.*, 29 F.3d

280, 285–86 (7th Cir. 1994) (holding that a CRA is not liable for reporting inaccurate

information if it relies on official court dockets).  Therefore, a key consideration in

many cases is whether the CRA has a reason to know that information is incorrect.

*See Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir. 1997) (noting that a

CRA is not required to "go beyond the original source of information" under Section

1681e(b)); *Henson*, 29 F.3d at 285–86.  Regardless of whether the CRA had notice though, the CRA may still "escape liability if it establishes that an inaccurate report was generated by following reasonable procedures, which will be jury question in the overwhelming majority of cases." *Cahlin v. Gen. Motors Acceptance Corp.*, 936 F.2d 1151, 1156 (11th Cir. 1991).

The undersigned addresses the notice issue first.  Experian argues that it did not have notice of any inaccuracy in Plaintiff's report, especially because she did not dispute the accuracy of the Account directly before initiating this suit.  (Doc. 59-2 at 18–19).  However, Plaintiff correctly argues in response that her failure to dispute the tradeline is not relevant to her claim under Section 1681e(b).  (*See* Doc. 54 at 8). The FCRA creates a separate cause of action if a CRA fails to conduct a reasonable investigation of information if a consumer disputes it.  *See* 15 U.S.C. § 1681i(a)(1)(A).  In contrast, Section 1681e(b) regulates a CRA's procedures, regardless of the action or inaction of a consumer.  As the Eleventh Circuit has noted, CRAs are required to do a more exacting reinvestigation if a consumer disputes information directly, as the burden of additional procedures is much lower for correcting individual errors.  *See Losch*, 995 F.3d at 945; *see also Cushman*, 115 F.3d at 225 ("In short, when one goes from the § 1681e(b) investigation to the § 1681i(a) reinvestigation, the likelihood that the cost-benefit analysis will shift in favor of the consumer increases markedly.").   If Plaintiff had disputed the

inaccuracy, then Experian would have a heightened obligation to conduct an individualized assessment of the Account under Section 1681i.  No such dispute occurred here, but that does not stop Plaintiff from challenging the reasonableness of Experian's procedures, as long as Experian already had notice of the inaccuracy.

There is no factual dispute that Experian had notice of Plaintiff's bankruptcy discharge, which in turn provided notice that Plaintiff's pre-petition debts were individually discharged.  Although Experian argues forcefully that there is no default rule regarding pre-petition debts for Chapter 7 bankruptcies, it is incorrect, as explained more fully above.  *See Medley v. Dish Network, LLC*, 958 F.3d 1063, 1067 (11th Cir. 2020) ("When a Chapter 7 debtor receives a discharge, she is discharged from all debts and 'any liability on a claim' that arose, or are determined to arise, before the bankruptcy is filed."); *see also Midland Funding, LLC v. Johnson*, 137 S. Ct. 1407, 1414 (2017) (stating generally that a discharge means that debt will not remain on a credit report).  Experian also argues at one point that it did not have notice that the Account was individually discharged because Plaintiff omitted it from her bankruptcy petition.  (Doc. 53 at 5).  As Experian states repeatedly in its briefs, (Doc. 53 at 15–16; Doc. 55 at 5–6), it is under no obligation to scour a bankruptcy docket or a debtor's particular schedule of debts in a bankruptcy petition, but that argument cuts both ways.  Just as Experian cannot be expected to determine the legal status of every debt for a consumer based on bankruptcy proceedings, it cannot rely

on an omission in Plaintiff's bankruptcy petition to suggest that it did not have notice of a discharge.

Experian also argues that it cannot be held liable when the effect of a discharge is unclear or requires legal counsel to determine. (Doc. 53 at 15–16). Experian cites, in relevant part, *Losch v. Experian Info. Sols.*, No. 2:18-809-FtM-PAM-MRM, 2020 WL 728606, at *3 (M.D. Fla. Feb. 12, 2020); *Hupfauer v. Citibank, N.A.*, 2016 WL 4506798, at * 7 (N.D. Ill Aug. 19, 2016); and *Cristobal v. Equifax, Inc.*, No. 16-cv-06329-JST, 2017 WL 1489274, at *3 n.4 (N.D. Cal. Apr. 26, 2017). However, the court's summary judgment findings in *Losch* were overturned on appeal. *See Losch v. Nationstar Mortgage LLC*, 995 F.3d 937 (11th Cir. 2021). Moreover, *Hupfauer* and *Cristobal* both involved Chapter 13 bankruptcies, which (unlike Chapter 7) subjects some pre-petition debts to a repayment plan. *See Harris v. Viegelahn*, 575 U.S. 510, 513–14 (2015). The entire purpose of a Chapter 7 bankruptcy is to liquidate the debtor's assets, distribute the proceeds to creditors, and then discharge the debtor's obligations in a "clean break from [the debtor's] financial past." *Id.* In short, the burden to determine whether a debt has been discharged in a Chapter 7 case is much lower than a Chapter 13 case. Therefore, Experian's cited authority on this issue is inapposite.

From a legal standpoint, there is nothing particularly complicated about the effect of a Chapter 7 bankruptcy. Experian's own procedures already recognize the

consequences of a general discharge in Chapter 7 bankruptcy.  Pursuant to the *White*

Order, Experian's initial scrub, which occurs automatically, marks certain accounts

as discharged if it meets certain criteria, and Experian's automated procedure does

not involve looking into the specifics of bankruptcy proceedings to determine

whether a debt was properly discharged.  Instead, Experian uses specific codes from

furnishers to designate that certain debts may be exempt from discharge,

corresponding to the enumerated exceptions of non-dischargeable debts in the

bankruptcy code.  *See White*, 2008 WL 11518799, at *11 (requiring Experian to

exclude any tradeline reported with a code pertaining to education loans, family

support, a government fine, and attorney's fees, among other exceptions).  Under

these circumstances, Experian cannot claim lack of knowledge of Plaintiff's

bankruptcy or the basic distinction of a Chapter 7 bankruptcy from other forms of

relief, such as a Chapter 13 bankruptcy.  The undisputed evidence shows that

Experian received notice of Plaintiff's Chapter 7 bankruptcy, and her credit file

reveals that Experian knew the Account predated that bankruptcy.  Those facts alone

are sufficient notice under the FCRA.  *See Losch*, 995 F.3d at 944–45.[15]

---

[15] The undersigned notes that the Eleventh Circuit described its holding in *Losch* as a "narrow one."  995 F.3d at 947.  There, the plaintiff was in an unusual situation because it was unclear whether he had properly rescinded a reaffirmation agreement related to his bankruptcy.  *Id.* at 940–41, 946.  Here, the effect of Plaintiff's bankruptcy on the Account is a much simpler matter, and even though the plaintiff in *Losch* had disputed the inaccurate tradeline, the Eleventh Circuit also concluded that the plaintiff had established a negligent violation of Section 1681e(b).

As for the reasonableness of the procedures themselves, the undersigned finds that there is a genuine dispute that precludes summary judgment for either party. First, Plaintiff has shown that Trans Union and Equifax did not report the same error related to the Account, which suggests that they have implemented stricter procedures to produce greater accuracy. (*See* Doc. 48-7 at 4–5; Doc. 48-8 at 3). Moreover, the fact that Experian updated its scrub procedures after the events underlying this case suggests that the change would not have been unduly burdensome. If Experian's initial scrub had included debts that were delinquent by only 30 days, rather than 90 days, then Plaintiff's May 2020 report would have been accurate, and inaccurate information may not have been sent to third parties.

As a general matter, Experian has produced little, if any, specific evidence of the cost or burden of updating its procedures to be more accurate. It has stated that its 90-day threshold for the initial scrub is designed to separate out debts that a consumer may wish to keep after their bankruptcy, (Rogers Decl. ¶ 16, Doc. 49-4), but it has not produced any evidence about how many consumers actually do so or whether its reporting would be more or less accurate if it implemented a procedure with a narrower delinquency threshold. Crediting its unilateral justification for the 90-day threshold—which Experian later changed—would effectively allow it to

---

*Id.* at 945–47. Therefore, despite the narrowness of the ruling, *Losch* is directly on point for many of the issues here.

determine the reasonableness of its own procedures, which the undersigned cannot do at summary judgment.

To be sure, Experian, like the other CRAs, must balance both the burden of implementing additional procedures and the risk that those procedures will produce inaccurate information.  If updated procedures are *overinclusive* of the debts that are updated to reflect a discharge through Chapter 7 bankruptcy, then Experian's reports are less valuable to creditors who rely on them to make informed judgments on extending credit to consumers.    However, if Experian's procedures are *underinclusive*, then it risks reporting inaccurate information about the consumer that may violate the FCRA.  Here, though, there is no evidence in the record about those risks.  A jury could find that Experian was reasonable in relying on the *White* Order, using a 90-day delinquency threshold to update debts after a Chapter 7 bankruptcy, and creating a look-back scrub to cover any omissions.  But on these facts, it could also find that Experian could have created marginally more accurate procedures at little-to-no cost and to the benefit of consumers like Plaintiff.  Thus, this case falls into the "overwhelming majority of cases" where the parties dispute the reasonableness of a CRA's procedures, and the matter should be submitted to a jury.  *See Cahlin*, 926 F.2d at 1156.   Accordingly, the undersigned **RECOMMENDS** that the District Court **DENY** both parties' motions for summary

judgment, as to Plaintiff's claim for a negligent violation of Section 1681e(b) of the FCRA.  *See* 15 U.S.C. § 1681o.

### iv.   *Plaintiff Has Not Provided Evidence of Willfulness*

As a final matter, Plaintiff has asserted that Experian both negligently and willfully violated Section 1681e(b).  (Doc. 48-2 at 11); *see* 15 U.S.C. §§ 1681n, 1681o.  Experian argues that, even if Plaintiff can show that its procedures were unreasonable, she cannot show a willful violation.  (Doc. 49-2 at 24–25).

To establish a willful violation of Section 1681e(b), a plaintiff must show that the defendant "either knowingly or recklessly violated" the FCRA.  *Pedro v. Equifax, Inc.*, 868 F.3d 1275, (11th Cir. 2017).  "A credit-reporting agency recklessly violates the Act if it takes an action that 'is not only a violation under a reasonable reading of the statute's terms, but shows that the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless.'"  *Losch*, 995 F.3d at 947 (quoting *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47 (2007)).  "A violation isn't willful where a defendant 'followed an interpretation that could reasonably found support in the court . . . .'"  *Id.* (quoting *Safeco*, 551 U.S. at 70 n.20).

Here, Plaintiff has not provided any evidence suggesting that Experian's procedures were a reckless or knowing violation of the law.  Experian's prior reliance on the *White* Order effectively forecloses this claim, as it relied on an

interpretation of Section 1681e(b) that a federal court approved.  Although Plaintiff's report was inaccurate for several months at a minimum, this case falls into the narrow category of instances where a pre-petition debt was not corrected by the initial scrub, and she retrieved her credit report before the look-back scrub had corrected the error. Under these circumstances, no reasonable jury would find that Experian's procedures were a reckless or knowing violation of the FCRA.  Accordingly, the undersigned **RECOMMENDS** that the District Court **GRANT** Experian's motion for summary judgment, as to Plaintiff's claim for a willful violation of Section 1681e(b) of the FCRA.  *See* 15 U.S.C. § 1681n.

## IV.   CONCLUSION

For the reasons stated above, the undersigned **RECOMMENDS** that the District Court **DENY** Plaintiff's Motion for Partial Summary Judgment (Doc. 48). As to Defendant's Motion for Summary Judgment (Doc. 49), the undersigned **RECOMMENDS** that the Court **DENY** the motion to the extent Experian seeks dismissal of Plaintiff's claim for a negligent violation of 15 U.S.C. § 1681e(b) and **GRANT** the motion to the extent Experian seeks dismissal of Plaintiff's claim for a willful violation.  *See* 15 U.S.C. §§ 1681n, 1681o.  Accordingly, Plaintiff's claim for a willful violation of Section 1681e(b) should be **DISMISSED WITH PREJUDICE**.  Moreover, Experian's Motion to Strike (Doc. 57) is **DENIED** as moot.  All pretrial matters have concluded with the issuance of this Report and

Recommendation in accordance with 28 U.S.C. § 636(b)(1), Local Rule 72.1, and

Standing Order 18-01. Therefore, the Clerk is **DIRECTED** to terminate the referral

to the undersigned Magistrate Judge.

IT IS SO **RECOMMENDED** on this 4th day of August 2021.

REGINA D. CANNON
United States Magistrate Judge